# EXHIBIT B

Srinivasa S. Rao, Pharm.D.
Director,
Regulatory Affairs

Sandoz Inc.
506 Carnegie Center
Suite 400
Princeton, NJ 08540

Tel:  609-627-8885 (Direct)
Tel:  609-627-8500 (Gen)
Fax:  609-395-2792

# △ SANDOZ

August 24, 2009

*VIA FEDERAL EXPRESS (FedEx)*

Pfizer Inc.
Pfizer Pharmaceuticals LLC
attn: General Counsel
235 East 42nd Street
New York, N.Y 10017

Warner-Lambert Company
c/o Pfizer Inc.
attn: General Counsel
235 East 42nd Street
New York, N.Y 10017

C.P. Pharmaceuticals International C.V.
c/o Pfizer Inc.
attn: General Counsel
235 East 42nd Street
New York, N.Y 10017

Rudolf E. Hutz, Esq.
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
Wilmington, DE 19899

Re:    **Notice of Certification Under 21 U.S.C. § 355(j)(2)(B) (§ 505(j)(2)(B)) of Federal Food, Drug and Cosmetic Act) and 21 C.F.R. § 314.95 Sandoz Inc.'s Amlodipine Besylate and Atorvastatin Calcium Tablets, 5mg/80mg and 10mg/80mg Sandoz Inc.'s ANDA 91-462**

Dear Sir or Madam:

Sandoz Inc. ("Sandoz") of 506 Carnegie Center, Suite 400, Princeton, NJ 08540, U.S.A., hereby gives notice to the NDA holder and/or listed patent owner for the reference listed drug that the FDA has received an Abbreviated New Drug Application ("ANDA") for Amlodipine Besylate and Atorvastatin Calcium Tablets, 5mg/80mg and 10mg/80mg ("the Sandoz Product"), which contains data or information from required bioequivalence and/or bioavailability studies.

The FDA has assigned the Sandoz ANDA the number 91-462.

Page 2 of 16

Sandoz, by submitting its ANDA, seeks to obtain approval to engage in commercial manufacture, use and sale of the Sandoz Product prior to the expiration of the following U.S. Patent(s), which is/are listed in *Approved Drug Products with Therapeutic Equivalence Evaluation* (the "Orange Book") as having the indicated expiration date:

| Patent No. | Patent Owner | Patent Expiry | PEDs expiry |
|---|---|---|---|
| 5,686,104 | Warner-Lambert | 11 Nov 2014 | 11 May 2015 |
| 5,969,156 | Warner-Lambert | 08 Jul 2016 | 08 Jan 2017 |
| 6,126,971 | Warner-Lambert | 19 Jan 2013 | 19 Jul 2013 |
| 6,455,574 | Pfizer | 11 Aug 2018 | N/A |

The purpose of this communication is to provide the notice and information required by 21 U.S.C. § 355(j)(2)(B)(i) and/or (ii) (Sections 505(j)(2)(B)(i) and/or (ii) of the Food, Drug and Cosmetics Act) and to inform you that the Sandoz ANDA contains a certification under 21 U.S.C. §355(j)(2)(A)(vii)(IV), which asserts that the claims of said U.S. Nos. 5,686,104; 5,969,156; 6,126,971 and 6,455,574 are invalid ,unenforceable and/or will not be infringed by the manufacture, use or sale of the Sandoz Product.

A Detailed Statement of the factual and legal basis for Sandoz's opinion that the Listed Patents will not be infringed by the manufacture, use or sale of the Sandoz Products is attached hereto.

Offer for Confidential Access

An Offer of Confidential Access to relevant sections of the Sandoz ANDA pursuant to 21 U.S.C. § 355(j)(5)(C)(i)(III) is attached hereto.

Anticompetitive Behavior Warning

Please be warned of the following. It is an antitrust violation to assert a patent known not to be infringed. *Loctite v. Ultraseal*, 781 F.2nd 861 (Fed. Cir. 1985). As such, the attached Detailed Statement has outlined in the necessary detail that your patents are not, and cannot be, infringed by the subject matter described in the Sandoz ANDA. As such, your pursuit of an infringement action may be deemed to be an antitrust violation. In addition, it is an antitrust violation to assert a patent known not to be valid. *Handgards v. Ethicon*, 601 F.2nd 986 (9th Cir. 1979). If you launch any patent infringement lawsuit, either now or later, Sandoz may pursue the appropriate remedies against you, including seeking fees, costs, and sanctions for potential violations of Rule 11 (of the Civil Procedure Rules), exceptional case and frivolous suit statutes under the patent laws, and for violations of the antitrust laws, plus any remedy the court deems fit to award.

Reservation of Legal Rights

We reserve the right to allege the same, similar, different or new theories of non-infringement and/or invalidity and nothing in this Notice Letter or Detailed Statement shall be construed as to limit our rights to make any allegation in any subsequent litigation regarding any issue.

Page 3 of 16

Relevant Contact Information

If you have any inquiries concerning this notice or for any service of process or legal information, please contact:

Stephen R. Auten, Esq.
c/o Sandoz Inc.
506 Carnegie Center
Suite 400
Princeton, NJ  08540
(609) 627-8500
(609) 627-8636

Very truly yours,

_8/24/09_

Srinivasa S. Rao, Pharm.D.
Director, Regulatory Affairs
Sandoz Inc.

Attachments:

1.    Offer of Confidential Access
2.    Detailed Statement

## SANDOZ'S OFFER OF CONFIDENTIAL ACCESS
## PURSUANT TO 21 U.S.C. § 355(j)(5)(C)(i)(III)

Pursuant to 21 U.S.C. § 355(j)(5)(C)(i)(III), and subject to the restrictions detailed below, Sandoz hereby provides this Offer of Confidential Access ("Offer") to the NDA holder and the Patent owner (hereinafter, each "Company") for the sole purpose of determining whether to bring an action referred to in 21 U.S.C. § 355(j)(5)(B)(iii) with respect to the Listed Patents.

1.    This Offer is subject to the following restrictions as to persons entitled to access and the use and disposition of any information accessed:

A.    **Persons Entitled to Access:**  Persons entitled to access ("Authorized Evaluators") under this Offer of Confidential Access are restricted to:  (i) no more than two outside counsel engaged by each Company to represent it and the staff of such outside counsel, including paralegal, secretarial and clerical personnel who assist such counsel; and (ii) independent consultants and experts assisting in the evaluation of possible infringement of the Listed Patent and any employees and assistants under the control of such consultant or expert; provided that all such persons contemplated by this paragraph A. are identified to Sandoz in writing and are not involved in the prosecution of any patent(s) and/or regulatory approval related to amlodipine and/or atorvastatin.

B.    **Materials Accessible by Authorized Evaluators:**  A copy of the relevant sections of the ANDA, as determined by Sandoz, redacted to remove information of no relevance to any issue of patent infringement, will be provided for use by Authorized Evaluators.

C.    **Use of the ANDA and Information in the ANDA:**

(1) The ANDA and all information contained therein or derived therefrom may be used for the sole and limited purpose of evaluating possible infringement of the Listed Patent(s) and for no other purpose.

(2) Authorized Evaluators shall not disclose any information contained in or derived from the ANDA or any notes, analyses, studies or other documents to the extent that they reflect any information in the ANDA, to any person other than persons entitled to access under subsection 1.A.

(3) Notwithstanding the provisions of subsections 1.C.(1) and 1.C.(2) above, Authorized Evaluators shall be permitted to advise the Company whether to bring suit alleging infringement of the Listed Patent(s); provided, however, that the information in the ANDA is not thereby disclosed.

D.    **Disposition of the Information in the ANDA:**

(1) The Company agrees that if it does not file suit against Sandoz alleging infringement of one or more of the Listed Patents within forty-five (45) days of receipt of the Notice and Detailed Statement (the "45-day period"), which

Page 5 of 16

this Offer accompanies, the Company shall cause Authorized Evaluators within thirty (30) days after the expiration of the 45-day period, to destroy or return to Sandoz all portions of the ANDA provided, and all notes, analyses, studies or other documents to the extent that they contain information in the ANDA, and the Company shall notify Sandoz in writing within a reasonable time that this has been done.

(2) The Company agrees that if The Company files suit against Sandoz alleging infringement of one or more of the Listed Patents within the 45-day period:

(a) While the litigation is pending, the portions of the ANDA provided and all notes, analyses, studies or other documents to the extent that they contain information in the ANDA, shall be treated as information under the highest level of confidentiality under any protective order entered in the action brought against Sandoz. Until such a protective order is entered, subsections 1.C.(1) and 1.C.(2) above continue to apply.

(b) The Company shall cause Authorized Evaluators to destroy or return to Sandoz the portions of the ANDA provided and all notes, analyses, studies or other documents prepared to the extent that they contain information in the ANDA, within thirty (30) days after the final determination of the action brought against Sandoz.

E.    **Accidental Disclosure**: Should information contained in the ANDA be disclosed, inadvertently or otherwise, The Company shall, at its earliest reasonable opportunity, by and through Authorized Evaluators, contact Sandoz and identify:

(1) what has been disclosed;
(2) the individuals to whom such information has been disclosed; and
(3) steps taken by The Company and Authorized Evaluators to ensure the information in the ANDA is not further disseminated.

2.    The Company acknowledges that the violation of any provision of this Offer will cause irreparable injury to Sandoz, and that an adequate legal remedy does not exist. Sandoz, therefore, shall have the right, in addition to any other remedies available at law or in equity, to obtain from a court of competent jurisdiction an injunction to prohibit The Company from violating the terms of this Offer. The Company agrees that in such an action Sandoz is entitled to recover any and all damages, costs and expenses, including, but not limited to, all reasonable attorneys' fees, professional fees and court costs.

3.    Should any provision set forth in this Offer be found by a court of competent jurisdiction to be illegal, unconstitutional or unenforceable, the remaining provisions shall continue in full force and effect.

4.    Nothing contained herein shall be construed as a grant of any license or other right to use the information in the ANDA except for the purpose expressly stated herein.

Page 6 of 16

5.    When accepted by The Company, this document shall constitute the entire agreement of the parties with respect to the subject matter herein and may not be amended or modified except in writing executed by all of the parties.

6.    The Company may request access to the ANDA by executing one copy of this Offer where indicated and returning the executed copy, within a reasonable time before the expiration of the 45-day period, to Stephen R. Auten, Esq., 506 Carnegie Center, Suite 400, Princeton, NJ 08540. Thereupon, the terms contained in this document shall be considered an enforceable contract between Sandoz and The Company.

7.    The Company agrees that any claims for breach of this Agreement may be brought in courts located in the State of New Jersey and consents to the jurisdiction and venue of such courts for any such claims.

**SANDOZ INC.**
By its authorized agent:

_____  2|24|09

Srinivasa S. Rao, Pharm.D.
Director, Regulatory Affairs


**ACCEPTED AND AGREED:**


**Pfizer Inc.**                              **C.P. Pharmaceuticals International C.V.**
By its authorized agent:                     By its authorized agent:

Signature:                                   Signature:

_____                      _____

Name (Print):                                Name (Print):

_____                      _____

Title:                                       Title:

_____                      _____

Company:                                     Company:

_____                      _____

Date:                                        Date:

_____                      _____

Page 7 of 16

| Pfizer Pharmaceuticals LLC<br>By its authorized agent:<br><br>Signature:<br><br>---<br><br>Name (Print):<br><br>---<br><br>Title:<br><br>---<br><br>Company:<br><br>---<br><br>Date:<br><br>--- | Warner Lambert Company<br>By its authorized agent:<br><br>Signature:<br><br>---<br><br>Name (Print):<br><br>---<br><br>Title:<br><br>---<br><br>Company:<br><br>---<br><br>Date:<br><br>--- |
|---|---|

Page 8 of 16

## SANDOZ INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES FOR ITS OPINION THAT U.S. PATENT Nos. 5,686,104; 5,969,156, 6,126,971 AND 6,455,574 ARE INVALID, UNENFORCEABLE AND/OR WILL NOT INFRINGED BY THE MANUFACTURE, USE, SALE OR OFFER FOR SALE OF THE SANDOZ PRODUCT.

The following constitutes Sandoz's detailed statement of the factual and legal basis for its belief that U.S. Patent Nos.5,686,104; 5,969,156; 6,126,971 and 6,455,574 are invalid, unenforceable, and/or will not infringed by the manufacture, use, sale or offer for sale of Amlodipine Besylate and Atorvastatin Calcium Tablets, 5mg/80mg and 10mg/80mg (the "Sandoz Product"). This detailed statement will not preclude Sandoz from advancing any other grounds for invalidity, unenforceability, and/or non-infringement, or any other claim construction, as to the Listed Patents in the event of litigation.

Please be advised that Sandoz considers the information in this statement to be confidential, is disclosing this information solely to comply with 21 U.S.C. § 355(j)(2)(B) and 21 C.F.R. § 314.95, and requests that this information be protected from disclosure to third parties by means consistent with its own standards for protecting its own confidential information. THIS CONFIDENTIALITY APPLIES TO THIS STATEMENT, WHICH MAY NOT, AND SHOULD NOT, BE ATTACHED TO ANY COMPLAINT OR OTHER PUBLICLY AVAILABLE DOCUMENT. *See Biovail Labs., Inc. v. Anchen Pharms., Inc.*, 463 F.Supp.2d 1073, 1083 (C.D. Cal. 2006).

## I.      THE SANDOZ PRODUCT

The Sandoz Product is amlodipine besylate and atorvastatin calcium tablets, 5mg/80mg and 10mg/80mg

## II.     FACTUAL AND LEGAL BASIS FOR NONINFRINGEMENT AND/OR INVALIDITY

### A.  Non-Infringement

The first step in the assessment of patent infringement is to construe the claim terms, which is a matter of law for the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 116 S.Ct. 1384 (1996). Whether a product infringes a claim requires a two-step analysis. First, the claims must be interpreted. Second, the properly-interpreted claims must be compared to the accused product. *Markman*, 116 S. Ct. at 1393; *Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558 (Fed. Cir. 1996). To literally infringe a claim, the accused product must practice every limitation in the claim. *Texas Instrum.*, 90 F.3d at 1563.

A product may infringe a patent under the doctrine of equivalents if it contains elements equivalent to each claimed element of the patented invention. Depending upon the facts of a given case, such element-by-element equivalency may be established by proof of insubstantial differences in the role played by elements of the claim and the accused product, or by proof that an accused element performs substantially the same function, in

Page 9 of 16

substantially the same way, to produce substantially the same result as the claimed element of the patented invention. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997); see also *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605 (1950).

The doctrine of equivalents is also subject to the ancillary doctrine of prosecution history estoppel, which acts to limit infringement by otherwise equivalent products or processes. *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211 (Fed. Cir. 1995).

Furthermore, the doctrine of equivalents is constrained by the prior art. *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904 F.2d 677 (Fed. Cir. 1990). The doctrine does not permit a patent claim to encompass subject matter that could not have been patented. Id. ("[A] patentee should not be able to obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained from the PTO by literal claims."); see also *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995) (the doctrine of equivalents does not permit coverage of obvious or "trivial" variations of the prior art).

## B.  Invalidity

A patent is presumed valid. 35 U.S.C. § 282. This presumption places the burden of persuasion on the party challenging validity. *Smithkline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 885 (Fed. Cir. 1988). "[T]he presumption is one of law, not fact, and does not constitute 'evidence' to be weighed against a challenger's evidence." *Avia Group Int'l, Inc. v. L.A. Gear Calif., Inc.*, 853 F2d 1557, 1562 (Fed. Cir. 1988). The burden is "especially difficult" when the party asserting invalidity relies only upon prior art that was considered by the PTO. *Hewllett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990). "Where the [PTO] has considered a piece of prior art, and issued a patent notwithstanding that prior art, a court owes some deference to the PTO's decision." *Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1572 (Fed. Cir. 1992) (citation omitted). Even in such a case, the presumption can be overcome if the party challenging validity establishes invalidity by clear and convincing evidence. *Panduit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082, 1096 (Fed. Cir. 1985).

### i.  Anticipation

Invalidity of a patent claim may be established under the legal doctrine of anticipation. 35 U.S.C. § 102. A determination that a claimed invention is anticipated requires a showing that each feature (element) of a claim is found, either expressly or under principles of inherency, in a single prior art reference, or that the claimed invention was previously known or embodied in a single prior art device, product, or method. *Electro Med. Sys. S.A. v. Cooper Life Sciences*, 34 F.3d 1048 (Fed. Cir. 1994); *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559 (Fed. Cir. 1992). A feature is inherent in a prior art reference when it naturally (and always) occurs as a consequence of following the teachings of the reference. *Schering Corp. v. Geneva Pharms. Inc.*, 339 F.3d 1373 (Fed. Cir. 2003). Additional references may be relied upon, to explain terminology in the anticipating reference (*In re Baxter Travenol Labs*, 952 F.2d 388

Page 10 of 16

(Fed. Cir. 1991), to show that the anticipating reference is enabling (*In re Donohue*, 766 F.2d 531 (Fed. Cir. 1985); or to show that a characteristic not disclosed expressly in the reference is nonetheless inherent. *Schering Corp.*, 339 F.3d at 1379.

### ii.    Obviousness

A patent is invalid for obviousness if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). The following inquiries are pertinent to resolving this issue: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; and (3) the difference between the prior art and the claims at issue. *Graham*, 383 U.S. at 17. Obviousness is not determined in hindsight in view of the invention in question. Instead, prior art is considered by the hypothetical artisan at a time just before the invention was made. *Al-Site Corp. v. VSI Int'l*, 174 F.3d 1308, 132 (Fed. Cir. 1999).

A reference must be considered for all that is taught—disclosures that diverge and teach away from the invention as well as disclosures that point toward and teach the invention. *See In re Dow Chemical Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988). A reference teaches away if it would have led a person skilled in the art in a direction different from that taken by the inventor. *Monarch Knitting Mach. Corp. v. Sulzer Morat Gmbh*, 139 F.3d 877, 885 (Fed. Cir. 1998). "The degree of teaching away will of course depend on the particular facts; in general, a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by" the inventor. *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994). It is impermissible to select only those portions of a reference that support a given position and exclude other parts necessary to the full appreciation of what the reference fairly teaches. *Bausch & Lomb, Inc. v. Barnes-Hind*, 796 F.2d 443, 448 (Fed. Cir. 1986).

The United States Supreme Court has clarified certain aspects of the obviousness analysis, particularly with respect to the Federal Circuit's requirement that there be a "teaching suggestion, or motivation" to combine the teachings of two or more separate references. In *KSR Int'l Co. v. Teleflex, Inc.*, 127 S.Ct. 1727 (2007), the Court expressly rejected a rigid requirement for a motivation to combine, stating:

> [t]he obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents. The diversity of inventive pursuits and of modern technology counsels against limiting the analysis in this way.

*KSR*, 127 S.Ct. at 1741. The Court further stated:

> [i]n determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls. What matters is the objective reach of the claim. If the claim

Page 11 of 16

extends to what is obvious, it is invalid under §103. One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims.

*KSR*, 127 S.Ct. at 1741-42. Instructing that the obviousness analysis should not be limited by looking only at the problem that the patentee was trying to solve, the Court stated:

> [t]he question is not whether the combination was obvious to the patentee but whether the combination was obvious to a person with ordinary skill in the art. Under the correct analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.

*KSR*, 127 S.Ct. at 1742. The Court noted that in some instances, the fact that it may have been "obvious to try" to make a claimed invention may be dispositive:

> [w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under §103.

*Id.*

When examining the obviousness of a compound and/or a method of using that compound, structural similarity alone may be sufficient to give rise to an expectation that two compounds with similar structures will have similar properties. *In re Merck*, 800 F.2d 1091 (Fed. Cir. 1986), *citing, In re Payne*, 606 F.2d 303, 313 (C.C.P.A. 1979). Structural similarity between a claimed compound and prior art compounds creates a *prima facie* case of obviousness. *In re Dillon*, 919 F.2d 688 (Fed. Cir. 1990). The burden then falls on an applicant to rebut that *prima facie* case. *Id.* at 693. A rebuttal or counter-argument can consist of test data showing that the claimed compounds possess unexpectedly improved properties from the prior art compounds. All evidence of the properties of the claimed and prior art compounds must be considered in determining the ultimate question of patentability.

The "discovery," however, that the claimed compound possesses a property not disclosed in the prior art does not by itself defeat a *prima facie* case. *In re Dillon*, 919 F.2d at 693. *See also, In re Merck*, 800 F.2d at 1099, where the Federal Circuit stated:

> [t]he core of it is that, while there are some differences in degree between the properties of amitrptyline and imipramine, the compounds expectedly have the same type of biological activity. In the absence of evidence to show that the properties of the compounds differed in such an appreciable degree that the difference was really unexpected, we do not think that the

Board erred in its determination that appellant's evidence was insufficient to rebut the *prima facie* case.

Evidence of secondary considerations, if present, must be considered in determining obviousness, but there must be a nexus between such evidence and the merits of the claimed invention. *Graham*, 383 U.S. at 17. The existence of such evidence, however, does not control the obviousness determination. *Richardson-Vicks v. Upjohn Co.*, 122 F.3d 1476, 1483 (Fed. Cir. 1997). Examples of secondary considerations are commercial success, copying, prior failure of others, licenses under the patent, a long-standing need for the invention, unexpected results, skepticism by others in the art, and contemporaneous development by others. *Graham*, 383 U.S. at 17-18; *DMI, Inc.*, 802 F.2d at 425. Commercial success is not a relevant factor in determining obviousness where others were legally barred from practicing the invention. *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1376-77 (Fed. Cir. 2005).

### III.    U.S. PATENT NO. 5,686,104

The '104 patent issued on Nov. 11,1997, and Pfizer's pediatric exclusivity will expire on May 11, 2015. Claims 1, 14, 15, and 21 are independent, and so is arguably claim 6. Claims 1, 14, 15, and 21 relate to compositions and methods for treating hypercholesterolemia or hyperlipidemia, and these claims are limited by the required presence of an alkaline earth metal salt to stabilize the pharmaceutical formulation. Claim 6 is to a method for preparing a stable pharmaceutical composition by mixing an active ingredient with about 5% to 75% by weight of a stabilizing pharmaceutically acceptable additive. Claim 15 is to a method for preparing a stabilized pharmaceutical composition and requires the step of blending the milled drug with at least one drug-stabilizing alkaline earth metal salt additive. Claim 21 is to a peroral pharmaceutical composition and requires calcium carbonate.

The '104 patent specification defines "alkaline earth metal salt" to include calcium carbonate, calcium hydroxide, magnesium carbonate, magnesium hydroxide, magnesium silicate, magnesium aluminate, or aluminum magnesium hydroxide. (Col. 3, lines 20-25). As described herein, the Sandoz ANDA formulation contains an organic amine as what is ostensibly claimed s the "alkalizer" in the '104 patent and does not employ a stabilizing alkaline earth metal salt or an equivalent thereof and, therefore, would not infringe any claim of the '104 patent either literally or under the doctrine of equivalents.

During prosecution of the application that would become the '104 patent (U.S. Patent Appl. SN 08/246,919), Pfizer narrowed the scope of claim 1, which originally recited "at least one stabilizing pharmaceutically acceptable metal salt additive," to recite "at least one stabilizing pharmaceutically acceptable *alkaline earth* metal salt additive." Amend, of Aug. 7,1997, S/N 08/246,919. Pfizer also narrowed original claim 16 (issued claim 15) from "blending the milled drug with at least one drug-stabilizing additive" to "blending the milled drug with at least one drug-stabilizing *alkaline earth metal salt* additive." *Id.* Both of these amendments were made in response to rejections under 35 U.S.C. § 112, first paragraph. *Id.*

As such, under the doctrine of prosecution history estoppel, Pfizer has made claim amendments that narrowed the scope of the claims and were made to secure the patent. See *Festo Corp.*, 535 U.S. at 736,122 S.Ct. at 1840. Any argument as to whether the scope of

Page 13 of 16

claims 1 and 15, as originally filed, may have covered an organic amine as an equivalent to a "metal salt" or a "drug-stabilizing additive" is now moot because Pfizer surrendered such equivalents when it narrowed the claims to obtain allowance of the '104 patent. Therefore, the issued claims cannot cover the amine in Sandoz's formulation as an equivalent to "alkaline earth metal salt."

In short, the Sandoz ANDA formulation does not and will not infringe any claim of the '104 patent literally or under the doctrine of equivalents because it will employ an organic amine and not a stabilizing alkaline earth metal salt or any equivalent substance, as required by the independent claims of the '104 patent.

## IV.    U.S. PATENT NO. 5,969,156

The '156 patent issued on October 19,1999, and Pfizer's period of pediatric exclusivity will expire on January 6, 2017.  The '156 patent, as issued, had 44 claims.  However, the claims were reexamined and the Ex Parte Reexamination Certificate issued on September 26, 2006. The '156 patent, after reexamination, has 117 claims.  Claims 1-9, 28-69, 100-110, and 113-117 are independent.  All of the independent claims of the '156 patent recite a "crystalline" form of atorvastatin.  The crystalline form is a *sine qua non* to the alleged invention claimed by the '156 patent.  Because the Sandoz ANDA product employs an amorphous and not a crystalline form of atorvastatin, there is no infringement of any claim of the '156 patent either literally or under the doctrine of equivalents.

Pfizer cannot cogently argue that the amorphous atorvastatin form is an equivalent of the claimed crystalline form due to prosecution history estoppel.  During prosecution, Pfizer clearly distinguished between amorphous atorvastatin and the claimed crystalline atorvastatin. See Amend. and Rem., Dec. 4,1998, S/N 08/945,812.  Therefore, the Sandoz ANDA formulation does not infringe under the doctrine of equivalents.

## V.    U.S. PATENT NO. 6,126,971

The '971 patent issued on October 3, 2000, and Pfizer's period of pediatric exclusivity will expire on July 19, 2013.  The '971 patent has 19 claims.  The independent claims are 1, 4, 7, 8, 13, 16, and 17.  Claims 1-7 and 17-19 are drawn to stable pharmaceutical compositions. All other claims are drawn to a method of improving the stability of the claimed composition. All 19 claims of the '971 patent require the presence of an "alkaline earth metal salt," such as calcium carbonate, in the compositions and methods.  The Sandoz ANDA formulation does not contain or employ an alkaline earth metal salt, including calcium carbonate, to stabilize the formulation and, therefore, will not infringe any claim of the '971 patent either literally or under the doctrine of equivalents.

The Sandoz ANDA formulation will not infringe the '971 patent either literally or under the doctrine of equivalents.  The '971 patent is a continuation of, and claims priority to, U.S. Patent Appl. SN 08/246,919, which issued as the '104 patent just described. Claims 1, 4, 7, 8,13,16, and 17 are independent.  As such, the arguments described above as to the '104 patent apply equally to the '971 patent.

Page 14 of 16

Claims 1 and 4 are to pharmaceutical compositions and each requires "about 5% to about 75% by weight of the composition of calcium carbonate to stabilize the composition." Claim 7 is also to a pharmaceutical composition and requires "an effective amount of calcium carbonate." Claims 8, 13, and 16 are to methods of improving the stability of a pharmaceutical composition "by adding an effective amount of an alkaline earth metal salt to the composition." Claim 17 is to a pharmaceutical composition and requires "at least one stabilizing pharmaceutically acceptable calcium or lithium salt additive."

The Sandoz ANDA formulation does not contain calcium carbonate, nor any "stabilizing" alkaline earth metal salt, nor a calcium or lithium salt additive. As stated above, the Sandoz ANDA formulation has an organic amine, which is not an alkaline earth metal salt, and cannot be construed to satisfy the requirement for an alkaline earth metal salt.

As to equivalents, there is no infringement under this theory because Pfizer filed a preliminary amendment with the continuation application that would become the '971 patent that amended claim 1. Prelim. Amend., June 26,1997, S/N 08/886,982. Claim 1 originally recited "at least one stabilizing pharmaceutically acceptable metal salt additive," and was amended to recite "an effective amount of calcium carbonate to stabilize the composition." *Id.* The preliminary amendment also cancelled claims 2-21, which were identical to the claims originally filed in the parent case. *Id.* The amendment also added new claims, which would become claims 7, 8, 13, 16, and 17. *Id.* With respect to claim 8, which arguably includes the broadest "stabilizing" limitation, Pfizer also surrendered equivalents to a "metal salt" additive by canceling claims 2-21 and adding claim 8, which claimed an "alkaline earth metal salt." As such, Pfizer is estopped from now asserting that an organic amine is equivalent to an "alkaline earth metal salt."

Therefore, the Sandoz ANDA formulation contains no substance that could be construed as equivalent to an alkaline earth metal salt and will not benefit in any way from the invention disclosed in the '971 patent. The Sandoz ANDA formulation will not infringe the '971 patent under the doctrine of equivalents.

## VI.    U.S. PATENT NO. 6,455,574

The '574 patent issued on September 24, 2002 and expires on August 11, 2018. The '574 patent claims priority to *U.S.* provisional application S/N 60/057,275 filed August 29,1997. The '574 patent has 12 claims, all of which are directed to methods of treating hypertension and hyperlipidemia by administering a single pharmaceutical composition containing amlodipine besylate and atorvastatin hemicalcium salt.

As described in detail below, all the '574 patent claims are invalid as obvious under 35 U.S.C. § 103(a) in view of at least U.S. Patent Nos. 5,155,120 and 5,273,995, and Jukema et al., *Arteriosclerosis, Thrombosis and Vascular Biology*, Vol. 16, pp. 425-430 (1996), and further in view of Bakker-Arkema et al., JAMA, Vol. 275, No. 2, pp. 128-133 (1996). The '574 patent claims a method of treating hypertension and hyperlipidemia by administering a single pharmaceutical composition containing amlodipine besylate and the atorvastatin hemicalcium salt. A short description of the prior art follows:

Page 15 of 16

- The '995 patent discloses that the enantiomer of the atorvastatin hemicalcium salt is useful for inhibiting cholesterol biosynthesis.

- The '120 patent discloses that amlodipine is useful for treating hypertension.

- Jukema is entitled "Evidence for a synergistic effect of calcium channel blockers with lipid-lowering therapy in retarding progression of coronary atherosclerosis in symptomatic patients with normal to moderately raised cholesterol levels" and discloses a clinical trial (REGRESS) in which patients took pravastatin (a cholesterol biosynthesis inhibitor of the same class as atorvastatin) together with one of four calcium channel blockers (CCBs): nifedipine, amlodipine, diltiazem and verapamil.

- Bakker-Arkema discloses that (1) atorvastatin is a well-tolerated drug that produces profound reductions in the reductions of low density lipoprotein–cholesterol (LDL) and unique reductions in very low density lipoprotein-cholesterol (VLDL) and triglycerides in hypertriglyceride patients, and (2) "atorvastatin appears to offer greater efficacy in the reduction of trglycerides, LDL and VLDL levels than other reductase inhibitors with similar safety profiles" (p. 133).

As to Jukema, with such a small genus of CCBs, those skilled in the art would have recognized that the article's conclusion in the abstract that "the addition of a CCBs to (pravastatin) acts synergistically in retarding the progression of established coronary atherosclerosis" applies equally to each of the four name CCBs, and could have easily picked amlodipine without undue experimentation. Jukema also motivates one skilled in the art to combine the known therapeutic compounds, thereby creating the fixed combination for both known activities. *See also KSR Int'l. Co, v. Teleflex Inc.*, 127 S. Ct. 1727, at 1740 (2007) (stating that "[t]he combination of familiar elements according to known methods is likely obvious when it does no more than yield predictable results").

Bakker-Arkema suggests to substitute atorvastatin for pravastatin because of atorvastatin's greater efficacy and similar safety profile compared to pravastatin. In fact, CADUET's product information sheet discloses that the bioavailability of amlodipine and atorvastatin from the fixed combination are not significantly different than when administered separately. As such, there are no unexpected results with the fixed combination.

Also supporting the invalidity of all the claims of the '574 patent is the May 4, 2006 opinion of the Board of Patent Appeals and Interferences affirming the Patent Examiner's final rejection of Pfizer's claims to the fixed dose combination in SN 10/214,058. The claims were rejected as obvious over the '995 and '120 patents and Jukema. To date, we are not aware of any U.S. claims that have issued to the combination *per se*.

Lest there be any doubt, all but one of the five applications (to the combination *per se*) related to the '574 patent have been abandoned in view of repeated rejections from the USPTO.[1] Most recently, in an Office Action dated October 21, 2008 (copy enclosed), as to application serial no. 11/499,753, the USPTO rejected all the claims, stating that:

---

[1] The only pending application is serial no. 11/448,100, which was filed on June 6, 2006, and has never been examined.

Page 16 of 16

[o]ne having ordinary skill in the art would have been motivated to combine amlodipine and atorvastatin in a pharmaceutical composition to be administered in treating coronary atherosclerosis and to combine the atorvastatin composition of [the '995 patent] and the amlodipine composition of [the '120 patent] into a single pharmaceutical composition since atorvastatin as a HMG-CoA reductase inhibitor is known to be useful in pharmaceutical compositions for treating atherosclerosis by lowering lipid/cholesterol levels according to [the '995 patent] and Jekema *et al.*, and amlodipine as a calcium channel blocker is known to be useful in pharmaceutical compositions for treating ischemic heart disease and congestive heart failure and hypertension according to [the '120 patent]. Therefore, one of ordinary skill in the art would have reasonably expected that combining amlodipine and atorvastatin or combining the atorvastatin composition of [the '995 patent] and the amlodipine composition of [the '120 patent] into a single pharmaceutical composition, known useful for the same purpose, *i.e.*, atherosclerosis or ischemic heart disease, in a single composition to be administered would improve the therapeutic effect for treating [same].

Since all composition components herein, *i.e.*, amlodipine and atorvastatin, are known to be useful to treat atherosclerosis or heart disease, it is consider *prima facie* obvious to combine them into a single composition useful for the very same purpose. At least the additive therapeutic effects would have been reasonably expected.

Office Action of Oct. 21, 2008 at pp. 5-6 (emphasis added).

In view of these repeated rejections, particularly the above language regarding the obvious use of the combination product, as well as Pfizer's abandonment of the combination composition applications, we respectfully submit that the claims of the '574 patent are invalid as obvious.

## SUMMARY

For the reasons stated above, the proposed Sandoz ANDA formulation would not infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of U.S. Patent Nos. 5,686,104; 5,969,156; 6,126,971 and 6,455,574.

Srinivasa S. Rao, Pharm.D.
Director, Regulatory Affairs
Sandoz Inc.